UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
ELIZABETH FISHER, et al.,

                                Plaintiffs,

                   -against-

CYNTHIA TICE,

                                Defendant.
------------------------------------------------------------------------X

                  :       15cv955 (LAK) (DF)

                  :       **REPORT AND**
                  :       **RECOMMENDATION**

                  :

                  :

**TO THE HONORABLE LEWIS A. KAPLAN, U.S.D.J.:**

        In this diversity action, referred to this Court for general pretrial supervision, plaintiffs

Elizabeth Fisher ("Fisher") and Wendy H. Krivit ("Krivit") (collectively, "Plaintiffs") assert

state-law claims against defendant Cynthia Tice ("Defendant" or "Tice") for breach of contract

and breach of fiduciary duty.  Plaintiffs contend that they entered into an oral joint-venture

agreement with Tice to develop and market a naturally sweetened chocolate bar.  They also

contend that Tice breached both her obligations under that agreement and her fiduciary duty to

Plaintiffs when she began selling naturally sweetened chocolate bars through her own, separate

company, Lily's Sweets, LLC ("Lily's Sweets").  Tice, for her part, maintains that, even if she

entered into a joint venture agreement with Fisher, Krivit was never a party to that agreement,

and, further, that any agreement that she may have had with Fisher was terminated before Lily's

Sweets was formed.  Currently before this Court are two motions filed by Tice:  one for

summary judgment in her favor on each of Plaintiffs' claims, and one for Rule 11 sanctions

based on the purportedly frivolous nature of those claims.  For the reasons set forth below, I

respectfully recommend that Tice's summary judgment motion be granted, but that her sanctions

motion be denied.

## BACKGROUND

A.    **Factual Background**[1]

This case arises from a failed business relationship among three individuals – Fisher and Tice, and then Krivit – who had all sought to work together to develop and market a naturally sweetened chocolate bar.  The facts below are undisputed unless otherwise noted.

### 1.    Fisher and Tice Meet and Together Pursue the Development of a Naturally Sweetened Beverage

Plaintiff Fisher met defendant Tice in 2003, while Fisher was operating a food brokerage company called Coast to Coast Organics, Inc. ("Coast to Coast").  (Def. 56.1 Stmt. ¶ 5.)  Tice had herself been working in the natural food industry since the 1980s, holding positions such as consultant, buyer, and brand developer.  (*Id.* ¶¶ 1-3.)  When the two women met, Tice was working as a buyer, and she directed her clients to purchase food products through Fisher's company.  (*Id.* ¶ 5; *see also* Tice Decl. ¶ 10.)  As a result of their business relationship, Fisher and Tice became close friends, and the two proceeded to work together in several capacities over the next seven years.  (*See* Def. 56.1 Stmt. ¶ 5.)

---

[1] The facts summarized herein are taken from the parties' statements pursuant to Local Civil Rule 56.1 (Defendant's Rule 56.1 Statement, dated Nov. 13, 2015 ("Def. 56.1 Stmt.") (Dkt. 42); Plaintiffs' Response to Defendant's Rule 56.1 Statement, dated Dec. 14, 2015 ("Pl. 56.1 Stmt.") (Dkt. 49)), and from evidence they submitted in support of their respective filings (*see* Attorney Declarations at Dkts. 43, 50, 51, and 55, and exhibits attached thereto; Declaration of Cynthia Tice in Support of Defendant's Motion for Summary Judgment, dated Nov. 13, 2015 ("Tice Decl.") (Dkt. 44); Declaration of Plaintiff Elizabeth Fisher in Opposition to Defendant's Motion for Summary Judgment, dated Dec. 9, 2015 ("Fisher Decl.") (Dkt. 47); Declaration of Plaintiff Wendy H. Krivit in Opposition to Defendant's Motion for Summary Judgment, dated Dec. 9, 2015 ("Krivit Decl.") (Dkt. 48)).  Unless otherwise noted, citations herein to Defendant's Rule 56.1 Statement, without a cross-reference to Plaintiffs' Response, indicate that the cited factual assertion is not in dispute.  Where the parties' statements suggest that facts are in dispute, this Court has consulted the record and considered the parties' cited evidence.

In late 2007, Tice came up with an idea to develop and market a "stevia"-sweetened[2] beverage.  (*Id.* ¶ 12.)  The following year, in mid-2008, Fisher sent Tice an email with the subject line, "my promise," which Tice believed was sent in order to convince her to allow Fisher to work with her on the beverage.  (*Id.* ¶ 14.)  The email included promises such as, "I will not lie to you," "I will not side against you," "I will keep your secrets," and "I will never do anything to under mind [sic] your success professionally or personally."  (*Id.*; *see also* Declaration of James M. Smith in Support of Defendant's Motion for Summary Judgment, dated Nov. 13, 2015 ("Smith Decl.") (Dkt. 43), Ex. 7.[3])  Although Tice never responded, she later allowed Fisher to collaborate with her on the beverage.  (Def. 56.1 Stmt. ¶ 14.)

In the latter half of 2008, Fisher and Tice drafted a business plan for the beverage, hired a law firm to conduct a trademark search, engaged an individual to conduct a focus-group study for the beverage, opened a bank account for the beverage, and made presentations to potential investors.  (*Id.* ¶¶ 16, 17, 21-23.)  During this time period, Fisher and Tice also formed a company together called The Oz Group, Inc., in which they each held a 50% ownership interest.  (*Id.* ¶ 19.)  Tice maintains that the sole purpose of the company was to develop and market the beverage.  (*Id.*)

Fisher and Tice abandoned their beverage idea in early 2009 after they learned that larger companies were developing competing products.  (*Id.* ¶ 24.)

---

[2] "Stevia" is a natural sweetener derived from the stevia plant.  (Def 56.1 Stmt. ¶ 13.)

[3] Defendant's 56.1 Statement refers to this email as Smith Decl., Ex. 8, but this appears to be a typographical error.

2. **Fisher Hires Tice To Work for Coast to Coast**

While pursuing their beverage idea, Fisher and Tice worked together in another capacity, as well.  Beginning in September 2008, Tice began performing services for Fisher's company, Coast to Coast, either as a consultant or subcontractor.  (*Id.* ¶ 8; Pl. 56.1 Stmt. ¶ 8.) Tice accepted a $1,500-per-month retainer for the job, which was half of her standard rate for the type of work she was doing.  (*Id.*)

In June or July 2009, Fisher reduced Tice's retainer with Coast to Coast from $1,500 per month to $750 per month.  (Def. 56.1 Stmt. ¶ 27.)  Following this reduction in pay, Tice sent an email to Fisher stating, "Can't stop thinking about what I agreed to and now I'm here just completely upset and crying."  (*See id.*; *see also* Declaration of Laura Scileppi in Opposition to Defendant's Motion for Summary Judgment, dated Dec. 14, 2015 ("Scileppi Decl.") (Dkt. 50), Ex. Z.)  In her email, Tice also wrote to Fisher that she felt the two were "at an impass [sic] in terms of what [they felt was] fair," and that she was afraid that, if they could not reconcile their positions, their friendship would be "compromised."  (Scileppi Decl., Ex. Z.)  Tice also wrote that she felt that Fisher undervalued and underpaid her.  (*Id.*)  Although she added that she "really really love[d] and adore[d] [Fisher]," Tice also said in her email that Fisher had "manipulated" her and treated her in a way that was "painful and insulting."  (*Id.*)  Fisher responded by apologizing, stating that she understood what Tice was saying, and adding that she "missed [Tice] so much" while Tice was on vacation that her "day . . . seemed so bleak and unpromising."  (Smith Decl., Ex. 18.)  Fisher went on to explain the financial reasons for the pay reduction and the potential for Tice to earn more money at Coast to Coast if she worked on a commission basis.  (*Id.*)  At a later date, Fisher eliminated Tice's retainer entirely and began paying Tice on commission only.  (Def. 56.1 Stmt. ¶ 27.)

Fisher's decisions to reduce Tice's compensation with Coast to Coast "became a source of contention and friction" between the two.  (*Id.*)  At her deposition, Tice testified that she had been "angry at [Fisher] for a whole year" following their July 2009 disagreement about her Coast to Coast compensation.  (Scileppi Decl., Ex. B (Transcript of the Deposition of Cynthia Tice, conducted on Sept. 15, 2015 ("Tice Dep."), at 155-56).)

### 3.   Fisher and Tice Together Begin Pursuing the Development of a Naturally Sweetened Chocolate Bar

Fisher stated in her submitted Declaration that, around June or July of 2009, during a social visit with Tice, Fisher conceived of an idea to develop and market a stevia-sweetened chocolate bar (the "chocolate project").  (Fisher Decl. ¶ 8; *see also* Pl. 56.1 Stmt. ¶ 26.)  Tice testified that she did not recall who conceived of the idea, but agreed that the conversation about the idea occurred in June or July of 2009.  (Tice Dep., at 17-18; *see also* Def. 56.1 Stmt. ¶ 26.)  The record is unclear as to whether the idea for the chocolate project preceded or followed the women's July 2009 disagreement over Tice's compensation at Coast to Coast, but the record does show that Fisher and Tice pursued the chocolate project together, even after that disagreement.  (*See, e.g.*, Def. 56.1 Stmt. ¶¶ 28-30; Pl. 56.1 Stmt. ¶¶ 28-29.)

In September 2009, Tice began communicating with a company that formulated and supplied chocolate, so as to explore whether that company could create a stevia-sweetened "chocolate base" that would be to Fisher and Tice's liking.  (Def. 56.1 Stmt. ¶ 28; Pl. 56.1 Stmt. ¶ 28.)  That company subsequently provided stevia-sweetened chocolate samples to Tice on at least three occasions between December 2009 and June 2010.  (*Id.*)  Tice also enlisted the help of a separate flavoring company to assist in "refining" those samples.  (Def. 56.1 Stmt. ¶ 29; Pl. 56.1 Stmt. ¶ 29.)  Although emails in the record suggest that Tice was the point-of-contact in communicating with these companies and receiving the stevia-sweetened chocolate samples

from them, Fisher testified that she "was involved every step of the way" with respect to the samples.  (Scileppi Decl., Exs. Y, AS; Smith Decl., Ex. 74 (Transcript of the Deposition of Elizabeth Fisher, conducted Sept. 11, 2015 ("Fisher Dep."[4]), at 175-77).)

Both Fisher and Tice testified that they never drafted a business plan for the chocolate project.  (Tice Dep., at 214-15, 223-25; Fisher Dep., at 235.)  Fisher, however, stated in emails to third parties that the marketing and sales strategies for the chocolate project would be the same as the ones that Fisher and Tice had used for their earlier beverage idea.  (Scileppi Decl., Exs. F, P; *see also* Pl. 56.1 Stmt. ¶ 67; Fisher Decl. ¶ 9.)

### 4.     Fisher and Tice Involve Krivit

In late December 2009, Fisher and Tice continued work on the chocolate project by meeting with plaintiff Krivit over lunch for the purpose of discussing the graphics for the packaging of the chocolate bar.  (Def. 56.1 Stmt. ¶ 30.)  Krivit was a friend of Fisher's, and Fisher mentioned Krivit to Tice as a potential graphic designer for the chocolate project.  (*Id.* ¶ 30.)  At the time, Krivit had approximately 30 years of experience as a graphic designer and electronic art director for the television show "Good Morning America."  (*Id.* ¶¶ 30-32.)

The parties disagree as to what occurred at this lunch meeting.  According to Krivit, the meeting concluded with a verbal agreement that she would become the graphic designer for Fisher and Tice's proposed, but not-yet-formed, chocolate company, and, in return, she would receive a 10% interest in that company.  (Scileppi Decl., Ex. C (Transcript of the Deposition of Wendy H. Krivit, conducted on Aug. 27, 2015 ("Krivit Dep."), at 70-73).)  Fisher testified that she recalled extending Krivit an offer to become a 10% owner of the proposed company, which

---

[4] Fisher's husband, non-party Jeffrey Fisher, was also deposed in this matter.  All citations to "Fisher Dep.," however, refer to plaintiff Elizabeth Fisher's deposition.  Mr. Fisher's deposition is not cited in this Report and Recommendation.

Krivit then accepted, but Fisher did not recall if she made that offer at the lunch meeting or sometime later.  (Fisher Dep., at 321, 325-26.)  Tice, on the other hand, testified that she did not recall reaching an agreement with Krivit at the lunch meeting – or at any other time – that Krivit would receive a 10% ownership interest in the proposed company in exchange for graphic-design work.  (Tice Dep., at 217-19.)  Tice testified that she only "agreed to entertain the idea." (*Id.* at 218.)  She admitted, however, that she "might have been on the phone" at some point during the December 2009 lunch meeting, leaving Fisher and Krivit to talk between themselves. (*Id.* at 218-19.)

On January 1, 2010, Fisher sent Krivit an email, copying Tice, outlining Krivit's anticipated job responsibilities for the proposed chocolate company, and stating, "we (Fisher and Tice) felt if we both own 20-25% that we would offer you 10% [equity in the company]."  (Smith Decl., Ex. 25; *see also* Def. 56.1 Stmt. ¶ 33; Pl. 56.1 Stmt. ¶ 33.)  Following these points, Fisher wrote, "Please let us know if this sounds reasonable."  (Smith Decl., Ex. 25.) Fisher also wrote that she and Tice would be converting their company, The Oz Group, Inc., into an LLC, after which they would send Krivit a "letter of intent."  (*Id.*)  Fisher concluded her email by asking Krivit to share any designs that she had created for the chocolate project.  (*Id.*)

According to Krivit, the email simply documented the 10% ownership interest to which the parties had already agreed during their December 2009 lunch meeting.  (Krivit Dep., at 78-82.)  Tice, however, testified that she voiced an objection to Fisher regarding the 10% offer, and viewed the email as part of a negotiation with Krivit, not an agreement.  (Tice Dep., at 217-21.)  According to Tice, "there would be no agreement" until Oz Group, LLC was formed, and she and Fisher had made a final decision on engaging Krivit, based on the graphics that Krivit provided.  (*Id.*)  Fisher admitted during her deposition that she recalled Tice

expressing that the 10% ownership offer to Krivit was "a little high." (Fisher Dep., at 297-99.) Fisher insisted, however, that Tice had agreed on making the offer. (*Id.*) Outside of the contested 10% ownership issue, it is undisputed that Krivit did not agree to share in the losses of the proposed chocolate company beyond her own potential losses in connection with her graphics work, and that Krivit would not have decision-making authority in the company, beyond the company's graphics. (Def. 56.1 Stmt. ¶¶ 49-50; Pl. 56.1 Stmt. ¶¶ 49-50.)

Krivit responded to Fisher's January 1, 2010 email on January 8, 2010 with some "rough" graphics for the chocolate bar. (Def. 56.1 Smt. ¶ 35; *see also* Scileppi Decl., Ex. M.) In addition to attaching graphics, Krivit's email requested that her initial ownership share of the proposed chocolate company equal half of Fisher and Tice's individual shares, rather than 10% of the company. (Def. 56.1 Smt. ¶ 35; Pl. 56.1 Stmt. ¶ 35; Scileppi Decl., Ex. M.) Fisher responded to the email, stating that she and Tice "[were] entertaining [Krivit's] offer and just need[ed] to think about it a bit more." (Def. 56.1 Stmt. ¶ 36; Scileppi Decl., Ex. P.) Fisher's email also noted that she and Tice "love[d]" the graphics, but they contained an error in the name of the chocolate bar. (Scileppi Decl., Ex. P.) With respect to Krivit's request about her ownership interest, Fisher never followed up further by email or any other written means, either accepting, rejecting, or proposing an alternative to Krivit's request. (Def. 56.1 Stmt. ¶ 37.)

In late May 2010, Fisher emailed Krivit, asking her to provide additional graphics for the stevia-sweetened chocolate bar. (Def. 56.1 Stmt. ¶ 39.) Krivit responded by email on May 28, 2010, providing the requested graphics. (*Id.*; *see also* Smith Decl., Ex. 41 (attaching five graphics).) This was the first time since January 8, 2010 that Krivit provided Fisher or Tice with any graphics for the chocolate project. (Def. 56.1 Stmt. ¶ 38.)

Fisher then responded to Krivit's May 28, 2010 email on June 1, 2010, informing Krivit that progress on the chocolate bar was "going slower than planned," and that she and Tice would "keep [Krivit] informed as [they] got closer." (*Id.* ¶ 40; Pl. 56.1 Stmt. ¶ 40.) The email also provided that Fisher and Tice would "maybe" "reconnect" with Krivit at a later time regarding the chocolate project, if Krivit were available. (Smith Decl., Ex. 42.) After May 28, 2010, Krivit never emailed or otherwise communicated with Fisher or Tice to check on the status of the chocolate project. (Def. 56.1 Stmt. ¶ 41.) She also did not perform any additional work for the chocolate project after that date. (*Id.*) Indeed, after Fisher's June 1, 2010 email, Krivit was not involved in any communication regarding the chocolate project. (*Id.* ¶ 40; Pl. 56.1 Stmt. ¶ 40.) The Oz Group, Inc. was never converted to an "LLC," as previously contemplated, and a "letter of intent" to Krivit was never written. (*See* Def. 56.1 Stmt. ¶¶ 42-43.)

**5.** **Fisher and Tice Agree To Go Their "Separate Ways"**

In early July 2010, Fisher and Tice tasted their most recently-acquired stevia-sweetened chocolate sample, and concluded that it was not ready to be marketed "due to an unpleasant aftertaste." (Def. 56.1 Stmt. ¶ 57.) In the end, the parties never developed a stevia-sweetened chocolate product together that was up to their standards. (*Id.* ¶ 66; Pl. 56.1 Stmt. ¶ 66; *see also* Def. 56.1 Stmt. ¶ 28.)

In late June or early July 2010, Fisher attempted to convince Tice to work for a company called Rob's Really Good LLC ("RRG") to market *its* chocolate and beverage products. (Def. 56.1 Stmt. ¶¶ 53, 55, 58; Pl. 56.1 Stmt. ¶ 55.) Although the parties dispute the reasons that Fisher was interested in having Tice work for RRG (Def. 56.1 Stmt. ¶ 54; Pl. 56.1 Stmt. ¶ 54), they do not dispute that Tice did not want to work for RRG, or that Tice ultimately declined Fisher's proposal to work for that company (Def. 56.1 Stmt. ¶ 58; *see also id.* ¶ 52; Pl. 56.1 Stmt.

¶ 52).  Tice testified that she had no desire to work with the principal of RRG, based on Fisher's description of her own experience working for him.  (Tice Dep., at 157-60, 164-65.)  Tice also testified that she was offended by Fisher's proposed financial offer in connection with the RRG engagement.  (*Id.*)  In her Declaration, Tice further added that "it was clear to [her] that working with [RRG] would compete with [her and Fisher's] efforts to develop and market a chocolate bar," and that they could not both market RRG's chocolate bar and their own chocolate bar. (Tice Decl. ¶ 16.)

After Tice declined Fisher's proposal to work for RRG, Fisher told Tice via telephone that, "(1) [Tice] was not sufficiently appreciative of all the favors [Fisher] had done for her; (2) [Tice] was indebted to [Fisher] for all [Fisher] had done for her; and (3) [Tice] would be nothing without [her]."  (Def. 56.1 Stmt. ¶ 58.)  Tice was "highly offended" by these statements and hung up the telephone after Fisher made the statements.  (*Id.*)

Fisher and Tice next communicated on July 12, 2010 by email, with Fisher writing to Tice first.  (Def. 56.1 Stmt. ¶¶ 60-61; Pl. 56.1 Stmt. ¶¶ 60-61; *see also* Scileppi Decl., Ex. W.)  In her email, Fisher discussed winding down Tice's relationship with Coast to Coast and working with RRG without Tice.  (Scileppi Decl., Ex. W; Fisher Dep., at 221.)  Regarding Coast to Coast, Fisher's email included a lengthy single-spaced discussion and multi-row, multi-column chart detailing Tice's past work for Coast to Coast, past payments to Tice for that work, and payments still owed to Tice.  (Scileppi Decl., Ex. W, at 1; Fisher Dep., at 221-24 (explaining that the acronyms in the email pertained to Coast to Coast matters).)  Fisher also stated in the email that she took offense to certain of Tice's comments regarding Coast to Coast clients.  (Scileppi Decl., Ex. W, at 1.)  Regarding RRG, Fisher described her critical view of how Tice had handled the potential RRG business arrangement, and explained why she had "lashed out" at Tice on their

recent telephone call about RRG.  (*Id.*)  On the second page of the email, Fisher continued by

stating,

> *I think it is best to go our separate ways.*  I will totally pay you on
> all orders on [a Coast to Coast client] for at least 90 days.  You do
> not need to call on Larry [ ] – just let it be.  Rob's I still do not
> have anything in writing so I think it best if I try to go that alone.
> Whatever happens going forward, please know how thankful I am
> for your friendship and I am sorry that [a Coast to Coast client] has
> not generated more income.  I am just not in a position to pay for
> your time.

(*Id.* at 2 (emphasis added).)  Fisher concluded by apologizing for the comments she had made to

Tice over the telephone, and by assuring Tice that everything would be "fine" and that she would

"pay [her] out" on certain Coast to Coast work.  (*Id.*)

Tice responded that same day by email, thanking Fisher for her apology and apologizing

for her own behavior towards Fisher.  (Smith Decl., Ex. 47.)  Tice also wrote:

> This fight between us is such a shame, and it is not to either of our
> credit.  I could not talk to you yesterday.  I was too upset and
> furious and I didn't want to risk making things even worse.  The
> conclusion in your letter is fine.  . . .
>
> I am totally upset, angry and sad.  I am having trouble calming
> down, and I really need to.  I love you and I still want to be your
> friend.  I will call you later, but I am not sure what there is to talk
> about with regards to this situation, so maybe we can just say hi.
>
> So I will consider that your conclusion supersedes mine and go
> with what you said.  And you are right, we will all be ok.

(*Id.*; Def. 56.1 Stmt. ¶ 61; Pl. 56.1 Stmt. ¶ 61.)

Tice attached a separate, fairly lengthy letter to her email, which she had apparently

written the night before.  (*See* Smith Decl., Ex. 47 ("I did write you a letter last night, but I was

holding on to it to make sure that it was what I wanted to say."); Tice Dep., at 176-81.)  In that

letter, Tice wrote, *inter alia*, that Fisher had "egregiously insulted [her], by implying that [she]

owe[d] [her] success to [Fisher]."  (Smith Decl., Ex. 47.)  She also wrote:  "I am not in a position

to give you my time.  I need to be paid."  (*Id.*)  Finally, she stated that (1) she was giving Fisher a

30-day resignation notice from working on Coast to Coast accounts, and (2) while she also

preferred not to work on the RRG project, she would do so in a "limited capacity," for 60 days

and a specified sum of money, if Fisher was "counting on [her]."  (*Id.*; see also Tice Dep., at

176-81.)  At her deposition, Tice testified that the resignation in her letter was "moot" because,

by the time she sent it to Fisher, Fisher had "already fired [her]" in Fisher's July 12, 2010 email.

(Tice Dep., at 177, 190-91.)

      Fisher ended the July 12 email string with the following short reply to Tice's email and

letter:

> I read everything here.  I think we should talk and maybe later in
> the week.  Just call me when you can.  I am going with it will all
> be fine.  [sic]  Let's just let it be.

(Smith Decl., Ex. 48; Def. 56.1 Stmt. ¶ 61; Pl. 56.1 Stmt. ¶ 61.)  At her deposition, Tice testified

that she was offended by this short response, and interpreted the response as Fisher treating her

like "her dog."  (Tice Dep., at 190-91.)

      With respect to Fisher's initial July 12, 2010 email, Tice testified that she interpreted

Fisher's sentence of, "I think it is best to our separate ways," to mean that they "were ending *all*

business together."  (*Id.* at 181 (emphasis added); *see also* Def. 56.1 Stmt. ¶ 62; Pl. 56.1 Stmt.

¶ 62.)  She further testified that she had agreed to this when she wrote back stating, "I will

consider that your conclusion supersedes mine and go with what you said."  (Tice Dep., at 189.)

Fisher, on the other hand, testified that when she wrote, "I think it is best to go our separate

ways," she only meant that "[Tice] would stop working with Coast to Coast."  (Fisher Dep., at

224.)  According to Fisher, the July 12, 2010 emails "strictly" pertained to Coast to Coast.  (*Id.* at

238.)

### 6.    Fisher, Tice, and Krivit Stop
### Communicating About the Chocolate Project

At her deposition, Fisher testified that, following her July 12, 2010 email exchange with Tice, she never had any "conversation with [Tice] about the development of the chocolate bar," never "sen[t] a letter or pick[ed] up the phone" to ask Tice "how [she was] doing on finalizing the development of [the] chocolate bar," never "schedule[d] a lunch where [she] could discuss the status of the development of the chocolate bar," never "draft[ed] a business plan for the Stevia sweetened chocolate bar," never "convert[ed] the Oz Group Inc. entity into a limited liability company," and never "draft[ed] a letter of intent for [Krivit] to express her interest . . . in the Oz Group Inc." (Fisher Dep., at 234-35; *see also* Def. 56.1 Stmt. ¶ 65; Pl. 56.1 Stmt. ¶ 65.) Tice similarly stated that, after their July 12, 2010 email exchange, she and Fisher "stopped communicating about all business," and Fisher "never contacted [her] again." (Tice Dep., at 189-90, 193-94.) Indeed, it is undisputed that, between July 12, 2010 and February 2012, Fisher, Krivit, and/or Tice "never communicated by e-mail, telephone, or in-person with one another about the chocolate project." (Def. 56.1 Stmt. ¶ 70.) According to Tice, Fisher's statement that they should go their separate ways, "coupled with the fact that [they] never spoke again[,] made it abundantly clear that [they] had ceased to do all business together." (Tice Dep., at 192.)

Despite her email exchange with Tice and their subsequent lack of communication, Fisher testified that she nonetheless believed that the chocolate project was ongoing, and that she "absolutely" intended to continue working with Tice on it. (Fisher Dep., at 224; Fisher Decl. ¶¶ 28-29.) In explaining why she did not contact Tice after their July 12, 2010 email exchange, Fisher stated that her responsibilities at her day job had increased. (Fisher Dep., at 238-39.) In this regard, it was only shortly after the email exchange that, according to Fisher, she negotiated an agreement with RRG by which Coast to Coast would market RRG's chocolate

13

bar and beverage.  (Def. 56.1 Stmt. ¶ 64.)  Fisher further explained that, after the July 12, 2010

email exchange, she "was treating [Tice] gently" and being "mindful" of Tice's message that

"she had to be compensated for her time."  (Fisher Dep., at 239; *see also* Smith Decl., Ex. 47.)

In explaining why she still did not contact Tice as time went on, Fisher testified that, in the

beginning of 2011, she began to feel ill, eventually receiving a diagnosis of ovarian cancer in

September 2011.  (Fisher Dep., at 238-39.)

As an additional justification for not contacting Tice after their July 12, 2010 email

exchange, Fisher explained her belief that "the ball was in [Tice's] court" with respect to the

chocolate project because Tice was "taking the lead" on developing the chocolate bar itself and

interfacing with their venture's chocolate formulator.  (Fisher Dep., at 233-34.)  In her

Declaration, Fisher elaborated that, "improv[ing] the stevia-sweetened chocolate product . . . fell

squarely within Tice's responsibilities."  (Fisher Decl. ¶ 22.)  According to Fisher, she and Tice

"divided the responsibilities" for the chocolate project, such that Fisher contributed:

> (i) the idea, (ii) [her] experience and know-how regarding the plan
> to target Whole Foods, (iii) [her] experience and know-how
> regarding the plan to use a charitable mission to market the
> chocolate bar, and (iv) [her] experience and know-how regarding
> the plan to use Fair Trade, but not organic ingredients.

(*Id.* ¶ 10; *see also* Pl. 56.1 Stmt. ¶ 61.)  Tice, Fisher contended, "was responsible for developing

the product," and Krivit "was responsible for developing the graphics."  (Fisher Decl. ¶ 10.)

When the product and graphics were complete, Fisher averred that she would then "use [her]

sales skills and network to launch the product."  (*Id.*)

Although communications among the parties regarding the chocolate project ceased after

July 12, 2010, the record suggests that Fisher and Tice continued to communicate about other

matters after that date.  For example, they exchanged emails in June 2011 regarding whether The

Oz Group, Inc. had been dissolved.  (Def. 56.1 Stmt. ¶ 72; Pl. 56.1 Stmt. ¶ 72; *see also* Scileppi

Decl. Ex. AE.)  Also, following Fisher's cancer diagnosis in September 2011, the record shows that Fisher and Tice began exchanging friendly emails with one another.  (*See* Exs. AF-AN, AY.)  None of the emails, however, mention the chocolate project.  (*See id.*; *see also* Def. 56.1 Stmt. ¶ 70.)  Finally, Fisher and Tice apparently spoke by telephone periodically following the July 12, 2010 email exchange.  (Declaration of Jennifer Rafuse in Opposition to Defendant's Motion for Summary Judgment, dated Dec. 14, 2015 ("Rafuse Decl.") (Dkt. 51), Ex. BC (purporting to summarize Fisher's outgoing telephone calls to Tice between July 2010 and July 2012).)  There is no testimony or other evidence, however, regarding what was discussed during those calls.

Apart from communications with Tice, Fisher mentioned the chocolate project in an email that she sent to Krivit's sister in October 2011.  (Def. 56.1 Stmt. ¶ 73; Pl. 56.1 Stmt. ¶ 73; Smith Decl., Ex. 62.)  In that email, Fisher stated that she and Krivit "*tried to do a business thing together but the wheels came off.*"  (Smith Decl., Ex. 62 (emphasis added).)  Fisher admitted in deposition that the "business thing" she was referring to was the chocolate project with both Krivit and Tice.  (Fisher Dep., at 261-64, 310.)  Fisher testified, however, that when she wrote, "the wheels came off," she meant that "the ball was in [Tice's] court for the [s]tevia chocolate bar," that "[they] had the disagreement over Coast to Coast," and that she "[got] sick."  (*Id.* at 261-63.)

### 7.   <u>Lily's Sweets</u>

In October 2010, months after the Fisher and Tice email exchange in which they agreed to "go [their] separate ways," a third party developed a stevia-sweetened chocolate base and began selling it on the open market.  (Def. 56.1 Stmt. ¶ 76.)  Tice contacted this third party and, in December 2010, tasted samples of its stevia-sweetened chocolate.  (*Id.* ¶ 77.)  In February

2011, Tice – without contacting Fisher or Krivit – reached out to her old business partner, Chuck Genuardi ("Genuardi"), regarding the idea of developing and marketing chocolate bars using this third party's stevia-sweetened chocolate.  (*Id.*)  Tice and Genuardi subsequently formed Lily's Sweets, LLC in June 2011, publicly filed its formation documents on July 5, 2011, and began selling stevia-sweetened chocolate products through the company in March 2012.  (*Id.* ¶¶ 78-79.)  At or around the time that Lily's Sweets' products were ready to be sold, at least two other companies were publicly selling stevia-sweetened chocolate bars.  (*Id.* ¶ 80; Pl. 56.1 Stmt. ¶ 80.)

Fisher stated in her Declaration that Tice told her about Lily's Sweets and its stevia-sweetened chocolate product in either March or April 2012.  (Fisher Decl. ¶ 32.)[5]  Krivit testified that Fisher shared this information with her in person, and that she told Fisher "to concentrate on her health" rather than feel angry.  (Krivit Dep., at 213-17.)  Tice conceded at her deposition that she told Fisher about Lily's Sweets at some point in 2012, but did not recall a more specific date. (Tice Dep., at 248.)

Fisher admitted at her deposition that she and Tice never expressly agreed to work exclusively with one another in pursuit of either their beverage or chocolate endeavors.  (Fisher Dep., at 111-15, 275-80; *see also* Tice Decl. ¶ 18.)  Fisher also admitted that she and Tice never expressly entered into a non-compete agreement.  (Def. 56.1 Stmt. ¶ 69; Pl. 56.1 Stmt. ¶ 69.)

B.   **Procedural History**

Fisher and Krivit initiated this lawsuit by filing a Complaint on February 9, 2015.  (*See* Compl.)  The Complaint alleges that Fisher, Tice, and Krivit "formed and pursued a joint venture to develop and market a zero-sugar, naturally sweetened chocolate bar," but that Tice

---

[5] The Complaint alleges that this communication occurred in February 2012.  (Complaint, filed February 9, 2015 ("Compl.") ¶ 21 (Dkt. 1).)

"misappropriated the ideas and know-how of the joint venture, started a new company that excluded Fisher and Krivit, and, with another investor, brought the chocolate bar to market."  (*Id.* ¶ 1.)  For this conduct, as noted above and discussed further below, Fisher and Krivit asserted claims against Tice for breach of contract and breach of fiduciary duty.  (*Id.* ¶¶ 25-35.)  In addition to damages, Plaintiffs sought the imposition of a constructive trust on Lily's Sweets. (*Id.* ¶¶ 28, 33.)

On November 13, 2015, Tice filed a motion for summary judgment, seeking dismissal of all of Plaintiffs' claims against her.  (*See* Motion for Summary Judgment, dated Nov. 13, 2015 (Dkt. 40), Memorandum of Law in Support of Defendant's Motion for Summary Judgment, dated Nov. 13, 2015 ("Def. Mem.") (Dkt. 41), Def. 56.1 Stmt. (Dkt. 42), Smith Decl. (Dkt. 43), Tice Decl. (Dkt. 44).)  On December 14, 2015, Fisher and Krivit filed a joint opposition to Tice's motion.  (*See* Memorandum of Law of Plaintiffs in Opposition to Defendant's Motion for Summary Judgment, dated Dec. 14, 2015 ("Pl. Opp. Mem.") (Dkt. 52), Pl. 56.1 Stmt. (Dkt. 49), Scileppi Decl. (Dkt. 50), Rafuse Decl. (Dkt. 51), Fisher Decl. (Dkt. 47), Krivit Decl. (Dkt. 48).)  On January 5, 2016, Tice filed a reply.  (*See* Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment, dated Jan. 5, 2016 ("Def. Reply") (Dkt. 54), Declaration of James Michael Smith in Support of Defendant's Motion for Summary Judgment, dated Jan. 5, 2016 ("Smith Reply Decl.") (Dkt. 55).)

In addition, on December 1, 2015, Tice served Plaintiffs with a four-page Notice of Motion for Rule 11 sanctions, summarizing in detail her grounds for Rule 11 sanctions against Plaintiffs and their counsel relating to alleged deficiencies in Plaintiffs' Complaint.  (Declaration of James Michael Smith in Support of Defendant's Motion for Rule 11 Sanctions, dated Jan. 22, 2016 ("Smith Sanctions Decl.") (Dkt. 60), Ex. 83 (Dkt. 60-5).)  Tice accompanied her Notice of

Motion with a demand that Plaintiffs voluntarily dismiss their Complaint with prejudice within 21 days. (*Id.*) Tice's demand went unanswered, and Tice filed her motion for Rule 11 sanctions on January 22, 2016.[6] (*See* Motion for Rule 11 Sanctions, dated Jan. 22, 2016 ("Def. Sanctions Mot.") (Dkt. 58), Memorandum of Law in Support of Defendant's Motion for Rule 11 Sanctions, dated Jan. 22, 2016 ("Def. Sanctions Mem.") (Dkt. 59); Smith Sanctions Decl.)

In her sanctions motion, Tice argues that Plaintiffs' Complaint lacked a factual and legal basis, and that a reasonable pre-filing inquiry by Plaintiffs' counsel would have revealed the Complaint's deficiencies. (*See* Def. Sanctions Mem., at 1.) As support, Tice largely repeats the arguments that she raised in her motion for summary judgment. On February 5, 2016, Fisher and Krivit filed a joint opposition to Tice's sanctions motion. (*See* Memorandum of Law of Plaintiffs in Opposition to Defendant's Motion for Sanctions, dated Feb. 5, 2016 ("Pl. Sanctions Opp. Mem.") (Dkt. 62), Declaration of Laura Scileppi in Opposition to Defendant's Motion for Sanctions, dated Feb. 5, 2016 ("Scileppi Sanctions Decl.") (Dkt. 63).) In this opposition, Plaintiffs largely repeat the arguments they made in their opposition to summary judgment. On February 19, 2016, Tice submitted a memorandum in reply. (*See* Reply Memorandum in Further Support of Defendant's Motion for Rule 11 Sanctions, dated Feb. 19, 2016 ("Def. Sanctions Reply") (Dkt. 67), Declaration of James Michael Smith in Further Support of Defendant's Motion for Rule 11 Sanctions, dated Feb. 19, 2016 ("Smith Sanctions Reply Decl.") (Dkt. 68).)

---

[6] Plaintiffs do not dispute that Tice complied with the Rule 11(c)(2) safe-harbor provision. Although Tice did not serve her supporting memorandum of law or exhibits 21 days in advance of filing the sanctions motion with the Court, Rule 11(c)(2) does not require supporting papers to be served in advance of filing, where those papers "rest[] on substantially the grounds set forth in the earlier [served] notice of motion." *See Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 176 (2d Cir. 2012). The Notice of Motion that Tice served on Plaintiffs on December 1, 2015 largely mirrors the filings she eventually made in support of her January 22, 2016 Rule 11 motion, and, therefore, Tice complied with the procedural requirements of the Rule.

## DISCUSSION

### I.   SUMMARY JUDGMENT STANDARDS

#### A.   Rule 56 of the Federal Rules of Civil Procedure

Under Rule 56(c), a motion for summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 128 (2d Cir. 1996). The moving party bears the burden of showing that no genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). This burden may be satisfied "by pointing out the absence of evidence to support the non-movant's claims." *Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 710 (2d Cir. 1991) (citing *Celotex*, 477 U.S. at 325).

Once the movant meets this burden, the non-moving party "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 322-23). Specifically, the non-moving party must cite to "particular parts of materials in the record" or show "that the materials cited [by the movant] do not establish the absence . . . of a genuine dispute" as to any material fact. Fed. R. Civ. P. 56(c)(1). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation," *Scott v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)), as "unsupported allegations do not create a material issue of fact," *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Rather, a plaintiff opposing summary judgment "must lay bare his proof in evidentiary form and raise an issue of fact sufficient to send to the jury." *Weiss v. La Suisse, Societe D'Assurances Sur La Vie,* 293 F. Supp. 2d 397, 408 (S.D.N.Y. 2003) (internal quotation marks and citations

omitted); *see Smith v. Menifee*, No. 00cv2521 (DC), 2002 WL 461514, at *3 (S.D.N.Y. Mar. 25, 2002) (holding that the non-moving party must present "significant probative evidence tending to support the complaint" (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968))).

In reviewing the evidentiary record, the court "must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001). If, even viewed in this light, there is not "sufficient evidence favoring the non[-]moving party for a jury to return a verdict for that party," or if the "evidence is not significantly probative," summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted). It is well-settled, however, that "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) (citations omitted). The issue for summary judgment is "not whether [the court] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [non-movant] on the evidence presented." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 788 (2d Cir. 2007) (internal quotation marks and citation omitted).

### B.    Local Civil Rule 56.1

Under this Court's rules, a party moving for summary judgment under Rule 56 must submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a).

"The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing the district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).  Local Rule 56.1, however, does not relieve the party seeking summary judgment of the burden of establishing that it is entitled to judgment as a matter of law.  *Id.*  Thus, the Court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement; it also must be satisfied that the moving party's assertions are supported by the record.  *See Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Zerafa v. Montefiore Hosp. Hous. Co.*, 403 F. Supp. 2d 320, 329 n.12 (S.D.N.Y. 2005).

## II.   <u>TICE'S MOTION FOR SUMMARY JUDGMENT</u>

Plaintiffs bring two claims against Tice in their Complaint:  breach of contract and breach of fiduciary duty.  (Compl. ¶¶ 25-35.)  With respect to the contract claim, Plaintiffs allege that Fisher and Tice entered into an "oral contract" in 2008, through which they

> agreed that they would work with each other to develop a soft drink product and they would not seek outside partners absent the agreement of the other.

(*Id.* ¶ 26.)  Plaintiffs further allege that

> Fisher and Tice modified their oral agreement in 2010 to include Krivit and to replace the soft drink product with a chocolate bar product.

(*Id.*)

Tice allegedly breached this modified contract "by forming a new company with Genuardi to develop the chocolate bar, excluding Fisher and Krivit."  (*Id.* ¶ 27.)  With respect to the breach-of-fiduciary-duty claim, Plaintiffs allege that the parties' oral contract "constituted a joint venture," and "[a]s a result of that joint venture, Tice owed a fiduciary duty to Fisher and Krivit."  (*Id.* ¶ 31.)  According to the Complaint, Tice then breached that fiduciary duty "by

excluding Fisher and Krivit from an ownership interest in Lily's [Sweets] and the revenue that resulted from it."  (*Id.* ¶ 32.)  A plain reading of the Complaint thus shows that both claims are founded on identical conduct:  the parties allegedly entered into an oral contract to develop a chocolate bar; that contract purportedly constituted a joint-venture agreement; and Tice allegedly breached that contract – and, through the same conduct, also breached the fiduciary duty that she owed to Fisher and Krivit – by forming a new company to develop the same type of chocolate bar to the exclusion of Fisher and Krivit.  (*Compare* Compl. ¶¶ 26-27 *with id.* ¶¶ 31-32.)

In her motion for summary judgment, Tice attacks the contract and fiduciary-duty claims simultaneously.  (*See* Def. Mem., at 12-13.)  She notes that both of Plaintiffs' claims are "premised on an oral joint venture project between Defendant Tice and Plaintiffs Fisher and Krivit."  (*Id.*)  Plaintiffs do not dispute Tice's treatment of the two claims as arising from the same conduct.  Indeed, they concede in their opposition to summary judgment that "[t]he contract and joint venture arise from the same set of facts and circumstances," thus contending that, "if there is a question of fact as to the breach of fiduciary duty claim, then there is a question of fact as to the breach of contract claim."  (Pl. Opp. Mem., at 3 n.3.)

In her motion, Tice asserts that she was never a party to any oral joint-venture agreement with Krivit, and, to the extent she may be found to have entered into such an agreement with Fisher, that agreement was dissolved or terminated before Tice took any action that might have otherwise violated the agreement or constituted a breach of any duty of loyalty.  Tice also argues that Plaintiffs are not entitled to a constructive trust should their claims survive, and that, in any event, Plaintiffs' breach-of-fiduciary-duty claim is time-barred.

In addressing Tice's motion for summary judgment, this Court first looks to whether the evidence in the record is capable of demonstrating that the alleged joint-venture agreement with

Krivit was ever formed.  Second, with respect to any such agreement between at least Fisher and

Tice, this Court examines Tice's contention that, based on the record, no reasonable jury could

find that the agreement continued past July 12, 2010, when Fisher sent her email to Tice,

suggesting they go their separate ways.

### A.   Tice's Challenge to the Claims Asserted by Krivit

Tice assumes, for the purposes of her motion for summary judgment only, that she and

Fisher formed an oral joint venture for a chocolate project, and that this joint venture

(hereinafter, "chocolate venture") existed until it was dissolved or terminated on or about

July 12, 2010.  (Def. Reply, at 2-3; *see also* Def. Mem., at 13.)  For this reason, Tice does not

seek summary judgment against Fisher on the ground that she and Fisher never entered into a

joint-venture agreement.  (*Id.*)  Tice does, however, seek summary judgment in her favor on any

claims asserted against her by Krivit, on the ground that no joint-venture agreement with *Krivit*

was ever formed.  (Def. Mem., at 18.)  Specifically, Tice contends that Krivit was never a party

to any agreement by which Fisher and Tice were to develop and market a chocolate bar because

Krivit never accepted Fisher's offer to enter into such an agreement, but instead, only made a

counter-offer, which was never accepted.  (*Id.* at 19.)  She also contends that the parties never

entered into a three-person joint venture because they never agreed that (1) Krivit would share in

the losses of the joint venture; (2) Krivit would have any decision-making authority over the

joint venture; and/or (3) Krivit would own a particular share of the joint venture's profits.  (*Id.*

at 18.)

### 1.   Required Elements of a Joint Venture

A joint-venture agreement is a particular type of contract.  Generally, under New York

law, contract formation requires "'an offer, acceptance of the offer, consideration, mutual assent,

and an intent to be bound.'"  *Kavitz v. Int'l Bus. Machs., Corp.*, 458 F. App'x 18, 19 (2d Cir.

2012) (quoting *Civil Serv. Emps. Ass'n Inc. v. Baldwin Union Free Sch. Dist.*, 924 N.Y.S.2d 126,

128 (2d Dep't 2011)).  These requirements apply to oral contracts, as well as to written ones.

*Oscar Prods., Inc. v. Zacharius*, 893 F. Supp. 250, 255-56 (S.D.N.Y. 1995).  To establish a claim

for breach of contract, a plaintiff must first prove "the existence of an agreement" and then must

demonstrate that he or she has adequately performed the contract, that the defendant has

breached its terms, and that damages have resulted.  *Eternity Global Master Fund Ltd. v. Morgan

Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (citation omitted).

> To establish the existence of a joint venture under New York law, a plaintiff must prove

that:

> > (1) two or more parties entered an agreement to create an
> > enterprise for profit, (2) the agreement evidences the parties'
> > mutual intent to be joint venturers, (3) each party contributed
> > property, financing, skill, knowledge, or effort to the venture,
> > (4) each party had some degree of joint management control over
> > the venture, and (5) there was a provision for the sharing of both
> > losses and profits.

*Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004) (citing *Itel

Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 909 F.2d 698, 701 (2d Cir. 1990)); *see

also Brown v. Cara*, 420 F.3d 148, 159-60 (2d Cir. 2005) (citing *Richbell Info. Servs., Inc. v.

Jupiter Partners, L.P.*, 765 N.Y.S.2d 575 (1st Dep't 2003)).  The absence of *any* of these

elements is "fatal" to proving the existence of a joint venture.  *Kidz Cloz, Inc.*, 320 F. Supp. 2d at

171 (citing *Zeising v. Kelly*, 152 F. Supp. 2d 335, 347-48 (S.D.N.Y. 2001)).

> Parties may prove their intent to create a joint venture "expressly through language in an

agreement or impliedly through actions and conduct."  *Cosy Goose Hellas v. Gosy Goose USA

Ltd.*, 581 F. Supp. 2d 606, 620 (S.D.N.Y. 2008) (citing *Kidz Cloz, Inc.*, 320 F. Supp. 2d at 171).

In other words, New York law recognizes oral joint ventures.  *Id.*  "[O]ral joint

venturers . . . may evince their intent to be bound as joint venturers by commingling their

property, skills, and efforts such that their individual contributions are subject to their co-venturers' actions, efforts, and failures." *Id.* (citing *Zeising*, 152 F. Supp. 2d at 348).  An oral joint venture agreement without a specified term or duration "is considered terminable at will and, therefore, falls outside the Statute of Frauds." *Am. Talent Agency Inc. v. Joe Fletcher Presents*, No. 06cv11415, 2008 WL 4155654, at *4 (S.D.N.Y. Sept. 9, 2008); *see also Cosy Goose Hellas*, 581 F. Supp. 2d at 617-18 (citing *Kidz Cloz, Inc.*, 320 F. Supp. 2d at 172).

A joint venture, once formed, operates "in a sense [as] a partnership for a limited purpose," *Itel Containers*, 909 F.2d at 701 (internal quotation marks and citation omitted), and "'it has long been recognized that the legal consequences of a joint venture are equivalent to those of a partnership,'" *id.* (quoting *Gramercy Equities v. Dumont*, 534 N.Y.S.2d 908, 911 (1988)); *see also Scholastic, Inc. v. Harris*, 259 F.3d 73, 84 (2d Cir. 2001) ("Under New York law joint ventures are governed by the same legal rules as partnerships . . . because a joint venture is essentially a partnership for a limited purpose." (citations omitted)).  Accordingly, in addition to having a contractual core, a joint venture creates a fiduciary relationship among the joint venturers.  *See Gibbs v. Breed, Abbott & Morgan,* 710 N.Y.S.2d 578, 581 (1st Dep't 2000) (noting fiduciary duty owed by members of a partnership); *Sriraman v. Patel*, 761 F. Supp. 2d 7, 17-18 (E.D.N.Y. 2011) (same); *Kidz Cloz, Inc.*, 320 F. Supp. 2d at 171 (fiduciary duty owed by joint venture partners); *Cosy Goose Hellas*, 581 F. Supp. 2d at 620 (same).  Indeed, joint venturers "owe each other the finest loyalty and the utmost good faith throughout the course of the enterprise." *Zeising*, 152 F. Supp. 2d at 346 (citing *Ebker v. Tan Jay Int'l, Ltd.*, 741 F. Supp. 448, 468 (S.D.N.Y. 1990), *aff'd*, 930 F.2d 909 (2d Cir.), *cert. denied*, 112 S. Ct. 161 (1991)); *see also Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429, 442-43 (S.D.N.Y. 2006) ("Joint adventurers . . . owe to one another, while the enterprise continues, the duty of the finest

loyalty. . . .  Not honesty alone, but the punctilio of an honor the most sensitive . . . ." (citing *Meinhard v. Salmon*, 249 N.Y. 458, 463-64 (1928))).

To establish a claim for a breach of fiduciary duty under New York law, a plaintiff must prove "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom."  *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) (citing *Barrett v. Freifeld*, 883 N.Y.S.2d 305, 308 (2d Dep't 2009)).

### 2.   Whether Krivit Can Show That She Entered Into an Oral Joint-Venture Agreement with Fisher and Tice

As noted, the first element of a joint venture is that "two or more parties entered an agreement to create an enterprise for profit."  *Kidz Cloz, Inc.*, 320 F. Supp. 2d at 171.  Here, the parties dispute whether Krivit entered into an oral agreement to develop and market a chocolate bar with Fisher and Tice, with Krivit asserting that she did enter into such an agreement, and Tice arguing that, at most, an offer was extended to Krivit, which Krivit did not accept.

It is well-settled that "a counteroffer constitutes a rejection of an offer as a matter of law."  *Blanc v. Capital One Bank*, No. 13cv7209 (NSR), 2015 WL 3919409, at *4 (S.D.N.Y. June 24, 2015) (internal quotation marks and citation omitted).  A "request for modification" of a contract, however, "coupled with an otherwise unqualified acceptance, which does not depend on the offeror's assent to the requested change, operates as an acceptance and a contract is thereby formed."  *Int'l Paper Co. v. Suwyn*, 966 F. Supp. 246, 254 (S.D.N.Y. 1997) (internal quotation marks and citations omitted).

In this case, there are genuine issues of fact regarding whether Krivit entered into the claimed joint-venture agreement.  It is undisputed that the December 2009 lunch meeting occurred and that the purpose of that meeting was to discuss graphics for the chocolate venture. (Def. 56.1 Stmt. ¶ 30.)  The parties dispute, however, what occurred at that meeting.  Krivit

essentially testified that, at that meeting, she accepted an offer to become a 10% owner of the chocolate venture, in exchange for becoming the venture's graphic designer.  (Krivit Dep., at 70-73.)  Fisher testified that, although she does not recall if she made that offer at the meeting, she does recall that she made the offer to Krivit at some point.  (Fisher Dep., at 297-99, 321, 325-26.)  She also testified that Tice approved of the offer, and that Krivit accepted it.  (*Id.*)  Tice, on the other hand, denied in deposition that the parties reached an oral agreement at the December 2009 meeting (Tice Dep., at 217-19), although she did testify that, for some part of the meeting, she "might have been on the phone" – and was thus potentially unaware of what was said during that time by Fisher and Krivit (*id.*).  Regardless, Tice denied that she ever approved of such an agreement.  (*Id.*)

In addition to this conflicting testimony, documentary evidence also suggests a genuine issue of fact as to the existence of an oral contract with Krivit.  Tice argues that Fisher's January 1, 2010 email to Krivit (which copied Tice) can only be read to constitute a mere offer to Krivit to join the chocolate venture, but, viewed in the light most favorable to Krivit, that email could reasonably be viewed, instead, as providing a summary of, and reasons behind, an offer that had already been extended – and that Krivit had accepted – at the December 2009 lunch meeting.  (*See* Smith Decl., Ex. 25.)  For example, a reasonable jury could interpret the email's statement that, "We do need to raise money and will be diluting our positions when we do that so we felt if we both own 20-25% that we would offer you 10%," as explaining why Fisher offered Krivit a 10% ownership stake at the December 2009 meeting.  (*See id.*)  Additionally, where the email lists Krivit's anticipated job responsibilities, discusses the 10% ownership issue, and then states, "Please let us know if this sounds reasonable," a reasonable jury could view the last

statement as relating to Krivit's anticipated job responsibilities, rather than to the 10% ownership issue, which, it could find, was already decided.  (*See id.*)

For these reasons, viewing the evidence in the light most favorable to Krivit and drawing all reasonable inferences in her favor, this Court cannot conclude that no triable issue exists as to whether she entered into an oral contract at the parties' December 2009 lunch meeting.  *See Oscar Prods., Inc.*, 893 F. Supp. at 254-56 ("It is possible that an oral contract was entered into at the [m]eeting, as plaintiffs maintain, and the [l]etter merely broadly recites the understanding reached rather than attempting to precisely document the contract. . . .  [T]his Court cannot conclude, as a matter of law, that the parties did not enter into an oral contract at the [m]eeting.").

**3.      Whether Krivit Can Demonstrate That She
Agreed to Share in the Joint Venture's Losses**

To stand as a *joint-venture* agreement, however, the parties' agreement must also contain "a provision for the sharing of both losses and profits."  *Kidz Cloz, Inc.*, 320 F. Supp. at 171.  As stated by the Second Circuit, the requirement that the parties have agreed to "'share in the profits of the business and submit to the burden of making good the losses'" of the business is "'an indispensable essential of a contract of . . . joint venture'" under New York law.  *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003) (quoting *Steinbeck v. Gerosa*, 175 N.Y.S.2d 1, 13 (1958)).  "If there was no agreement as to the manner in which the parties were to share in the profits and the losses, the agreement did not create a joint venture."  *Kidz Cloz, Inc.*, 320 F. Supp. 2d at 171-72 (internal quotation marks and citation omitted).

Moreover, "[n]umerous" courts have held that "a putative joint venturer who only stands to lose the value of his or her services rendered in connection with the venture does not submit himself or herself to the liabilities and losses of the venture and thus is not considered a joint

venturer." *Cosy Goose Hellas*, 581 F. Supp. 2d at 620-21 (collecting cases).  Indeed, if one only

stands to lose his or her contribution to the joint venture, "the risk of loss element becomes

'indistinguishable from the separate requirement that each joint venturer make some contribution

of property, financing, skill, knowledge or effort to the venture.'"  *Id.* at 622 (quoting *B. Lewis*

*Prods., Inc. v. Angelou*, 01cv530 (MBM), 2003 WL 21709465, at *12 (S.D.N.Y. July 23, 2003),

*aff'd in part*, 99 F. App'x 294 (2d Cir. 2004)); *see also Artco, Inc. v. Kiddie, Inc.*, No. 88cv5734

(MJL), 1993 WL 962596, at *10 (S.D.N.Y. Dec. 28, 1993) (noting that if "simply expending

efforts to set up a venture were sufficient to satisfy the essential element of sharing of losses, the

requirement could nearly always be satisfied . . . .").

      Accordingly, a party is not a partner to a joint venture unless he or she "agree[s], either

expressly or impliedly, to share liability for the possible obligations, debts, and losses of the joint

venture itself."  *Cosy Goose Hellas*, 581 F. Supp. 2d at 622 (citations omitted); *see also Dinaco,*

*Inc.*, 346 F.3d at 68 (holding a party did not agree to share in the losses of a joint venture where

it "never guaranteed or agreed to guaranty [its supposed joint venturer's] financial or contractual

obligations"); *Weinreich v. Sandhaus*, No. 83cv3966 (CES), 1989 WL 130641, at *4 (S.D.N.Y.

July 24, 1989) ("It would be inequitable to allow a party to claim the rights and benefits of

partnership or joint adventure, while at the same time, allow that party to disclaim the legal

liabilities which the relationship imposes.").  Loss sharing need not be equal among all parties to

a joint venture, but it must extend beyond the loss of individual services invested in the venture.

*See Milton Abeles, Inc. v. Creekstone Farms Premium Beef, LLC*, No. 06cv3893 (JFB) (AKT),

2009 WL 8785553, at *6 (E.D.N.Y. Mar. 30, 2009) (citations omitted).

      Here, Tice contends that the parties never agreed that Krivit would share in the losses of

the purported joint venture, and asserts that this fact is undisputed.  (Def. Mem., at 18.)  Krivit

29

does not challenge this assertion, except to argue that the parties understood that her participation could result in the loss of her time.  (Pl. Opp. Mem., at 7-8.)  Krivit also contends that she implicitly agreed to share in the expenses for paper, ink, and electricity relating to the production of her graphics.  (*Id.*)

In support of her position that these facts, if established, would be sufficient to satisfy the joint-venture requirement of "shared losses," Krivit relies on a "minority rule" among intermediate New York state courts holding that an agreement to bear the loss of "the value of [one's] services and [one's] contributions" is a sufficient loss sharing agreement for a joint venture, or "that when there is no reasonable expectation that the joint venture will suffer losses . . . , the law will imply an agreement to share losses in a manner similar to the parties' agreement to share profits."  (*Id.* at 7 (citing *Cosy Goose Hellas*, 581 F. Supp. 2d at 621 (recognizing minority rule and collecting cases[7]).)  The decisions setting forth this minority rule, however, "have come under heavy scrutiny and derision from judges [in the Southern District of New York] for not being in accord with the elements of a joint venture under New York law." *Cosy Goose Hellas*, 581 F. Supp. 2d at 621 (collecting cases rejecting the minority rule). Moreover, none of those decisions were issued by the New York Court of Appeals, which, along with the Second Circuit, has recognized the requirement that parties to a joint venture must agree to "submit to the burden of making good the losses" of the venture.  *Steinbeck*, 175 N.Y.S.2d at 13 (cited favorably by the Second Circuit in *Dinaco,* 346 F.3d at 68).  On issues of state law, this Court is bound by the Second Circuit's interpretation of New York state cases, or, if more

---

[7] The collected cases are *Cobblah v. Katende*, 713 N.Y.S.2d 723 (1st Dep't 2000); *Ramirez v. Goldberg*, 439 N.Y.S.2d 959 (2d Dep't 1981); *Penato v. George*, 383 N.Y.S.2d 900 (2d Dep't 1976); and *Mariani v. Summers*, 52 N.Y.S.2d 750 (Sup. Ct., N.Y. County 1944), *aff'd without opinion*, 56 N.Y.S.2d 537 (1st Dep't 1945).

recent, the New York Court of Appeals' decisions.  *See Adebiyi v. Yankee Fiber Control, Inc.*, 705 F. Supp. 2d 287, 291 n.4 (S.D.N.Y. 2010).  Thus, *Steinbeck* and *Dinaco*'s rule that a joint venturer must "submit to the burden of making good the losses" of the venture governs here.

To the extent that, as Krivit suggests, *Steinbeck* and *Dinco* are ambiguous on their view of the above-referenced "minority rule," this Court joins the courts in this District that have rejected the minority rule.  If a party could be deemed a joint venturer where he or she only agrees to bear the loss of his or her contributions to the joint venture, then the loss-sharing requirement of a joint venture would be "indistinguishable" from the requirement that one contribute "property, financing, skill, knowledge, or effort to the venture."  *See B. Lewis Prods., Inc.*, 2003 WL 21709465, at *12; *Artco, Inc.*, 1993 WL 962596, at *10.  Also, even if this Court were to subscribe to the second part of the minority rule, which would permit this Court to "imply" a loss-sharing agreement in the absence of a reasonable expectation of losses, Krivit has not come forward with any evidence from which a fair-minded jury could find that, in this case, "there [was] no reasonable expectation that the [chocolate] venture [would] suffer losses."  The evidence instead suggests that such food-product ventures present a real risk of loss.  On this point, the record reflects that Fisher and Tice shelved their previous beverage venture, and lost at least some of the value they invested in that venture, due to competition from larger companies. (*See* Def. 56.1 Stmt. ¶¶ 16, 17, 21-24.)

On the record before this Court, it is undisputed that Krivit never agreed to share in any losses related to Fisher and Tice's chocolate venture outside of the losses related to her graphic-design work.  (Def. 56.1 Stmt. ¶ 49; Pl. 56.1 Stmt. ¶ 49.)  As the absence of any of the elements of a joint venture is "fatal" to proving the existence of a joint-venture agreement, *Kidz Cloz, Inc.*, 320 F. Supp. 2d at 171, the Court need not reach Tice's other arguments regarding the supposed

31

insufficiency of Krivit's management control or profit-sharing agreement with the venture.  In short, absent evidence of an agreement to share in the alleged venture's losses, Krivit cannot demonstrate that she was a party to a joint venture with Fisher and Tice.  *See Cosy Goose Hellas*, 581 F. Supp. at 620-24.  Accordingly, as both her breach-of-contract and breach-of-fiduciary-duty claims against Tice arise out of a supposed joint-venture agreement,[8] I recommend that summary judgment be granted in Tice's favor on all of Krivit's claims.  *See Eternity Global,* 375 F.3d at 177 (requiring "the existence of an agreement" to establish a breach-of-contract claim); *Kidz Cloz, Inc.*, 320 F. Supp. 2d at 176 ("Because . . . [plaintiff] cannot establish as a matter of law the existence of an enforceable joint venture agreement . . . , [defendant] owed it no fiduciary obligations." (internal quotation marks and citation omitted)).

### B.    Tice's Challenge to the Claims Asserted by Fisher

Tice separately argues that she is entitled to summary judgment on Fisher's breach-of-contract and breach-of-fiduciary-duty claims because any alleged chocolate joint venture with Fisher was "dissolved" or "terminated" on or about July 12, 2010, when Fisher and Tice exchanged emails agreeing to "go [their] separate ways" (Def. Mem., at 14-17; Def. Reply, at 2) and before any alleged breach of contract or fiduciary duty by Tice.

---

[8] As noted above, the Complaint does not plead the existence of any contract separate from an alleged joint-venture agreement among the parties (*see* Compl. ¶ 26), and Krivit does not diverge from that allegation in opposition to Tice's summary judgment motion.  Thus, although Krivit perhaps could have contended in her opposition that she had a mere services agreement, pursuant to which she performed graphic-design services, but was not compensated (an argument she seems to suggest for the first time in response to Tice's sanctions motion (*see* Pl. Sanctions Opp. Mem., at 20)), she has not put forward evidence, under Rule 56, to advance such a position.  Further, she has also not shown that such a contract would have given rise to a fiduciary duty, and "[i]t is well-settled that the absence of a duty is fatal to a . . . fiduciary duty claim."  *Lumbermens Mut. Cas. Co. v. Franey Muha Allian Ins. Servs.*, 388 F. Supp. 2d 292, 303 (S.D.N.Y. 2005) (citing *Ne. Gen. Corp. v. Wellington Advert., Inc.*, 604 N.Y.S.2d 1, 3 (1993)).

1.    **Dissolution of an At-Will Joint Venture**

Tice asserts, and Fisher does not dispute, that their joint venture, assuming it existed, was an oral joint venture without a specified term or duration.  (*See* Def. Mem., at 14; *see* Pl. Opp. Mem., at 8-16; *see also* Compl. ¶¶ 26-27, 31-32.)  Where an oral joint venture agreement lacks a specified term or duration, it is "terminable at will" under New York law and is not barred by the New York Statute of Frauds.  *See Am. Talent Agency Inc.*, 2008 WL 4155654, at \*4; *Cosy Goose Hellas*, 581 F. Supp. 2d at 617-18.

Under New York law, an at-will joint venture "may be dissolved 'by conduct as well as words.'"  *Scholastic, Inc.*, 259 F.3d at 87 (citations omitted).  "Such dissolution occurs when either party manifests 'an unequivocal election' to cease the collaboration.'"  *Id.* (citation omitted).  "New York law is clear that a venture at will can be terminated without liability for breach of contract by any partner at any time by any act which evidences intent to terminate the association."  *Kidz Clos, Inc.*, 320 F. Supp. 2d at 172 (internal quotation marks and citations omitted); *see also Ebker*, 741 F. Supp. at 468-69 (noting that a partner to a joint venture may dissolve the joint venture "on a moment's notice without liability for breach of contract.").

On the other hand, whether conduct such as inaction or a lack of communication are sufficient to dissolve a joint venture is a generally question of fact.  *See Smith v. Maine*, 260 N.Y.S. 425, 431 (Sup. Ct., Westchester County 1932) ("It is a question of fact for me to determine whether such absences of the plaintiff were consistent with an intention to continue the partnership or to repudiate and desert it."); *see also In re Signature Apparel Grp. LLC*, No. 09-15378 (RG), 2015 WL 1009452, at \*13 (Bankr. S.D.N.Y. Mar. 4, 2015) (noting that repudiation of a contract is "generally" a "question of fact" and denying summary judgment where there was no written repudiation of the contract in question and the parties presented

conflicting evidence as to repudiation); *O'Connor v. Sleasman*, 788 N.Y.S.2d 518, 520 (3d Dep't 2005) (repudiation is a "factual determination" "heavily dependent upon a determination of whether a breaching party's words or deeds are unequivocal" (internal quotation marks and citations omitted)).

In *Aronow v. Sommer*, however, the First Department held that, "[a] party's silence after a repudiation can demonstrate the abandonment of a joint venture," making summary judgment appropriate.  714 N.Y.S.2d 51, 52 (1st Dep't 2000) (citing *Allen & Co. v. Occidental Petroleum Corp.*, 382 F. Supp. 1052, 1060-61 (S.D.N.Y. 1974), *aff'd*, 519 F.2d 788 (2d Cir. 1975)).  In that case, the purpose of the joint venture was to acquire and develop a casino. *Id.* at 52.  The court affirmed summary judgment in favor of the defendants where there was "intense animus between the parties" followed by "several months" of silence, despite the parties being aware that they should have been communicating due to an impending business transaction. *Id.* at 51-52; *see also Transp Grp. Managers v. Held*, 564 N.Y.S.2d 88, 89 (1st Dep't 1990) ("This was a partnership at will, dissolved de facto by the intense animus between the parties when the individual plaintiffs voted defendant out of control.").

Similarly, in *Mashihi v. 166-25 Hillside Partners*, the Second Department referenced the parties' inaction and lack of communication in holding that a partnership had been dissolved.[9] 859 N.Y.S.2d 202, 202-03 (2d Dep't 2008).  In that case, the at-will partnership's purpose was to acquire, operate, and maintain a specific parcel of real property. *Id.*  The court held that the partnership was "dissolved by operation of law" after the plaintiffs stopped managing the property and making financial contributions towards the maintenance of the property, and all

---

[9] As noted above, joint ventures are governed by the same legal rules as partnerships under New York law. *See Scholastic, Inc.*, 259 F.3d at 84.

communications between the plaintiffs and their partners, the defendants, ceased. *Id.* ("[T]he plaintiffs, through their actions, repudiated the partnership by [the time communications with defendants had ceased] at the latest, thus dissolving it at that time." (citations omitted)); *see also Czernicki v. Lawniczak*, 904 N.Y.S.2d 127, 131 (2010) ("[The] partnership at will . . . was dissolved by operation of law . . . when the defendant stopped managing the building, and his involvement in the enterprise ceased." (citation omitted)).

Once a joint venture is dissolved, it "'generally ceases carrying on of business in its normal course and its activities are limited to closing up [joint venture] affairs, disposing of assets and paying all creditors.'" *Scholastic, Inc.*, 259 F.3d at 85 (quoting *In re C-TC 9th Ave. P'ship*, 193 B.R. 650, 653 (Bankr. N.D.N.Y. 1995), *aff'd*, 196 B.R. 666 (N.D.N.Y. 1996), *aff'd*, 113 F.3d 1304 (2d Cir. 1997)). The fiduciary relationship among the partners to a joint venture generally "terminates upon notice of dissolution, even though the [joint venture's] affairs have not been wound up." *Ebker*, 741 F. Supp. at 469 (citations omitted). The partners' "duty of good faith and full disclosure," however, "continues as to dealings affecting the winding up of the partnership and the proper preservation of partnership assets during that period." *Id.* (citations omitted). Once the "winding-up process" is complete, the joint venture itself is "terminated." *Scholastic, Inc.*, 259 F.3d at 84-85.

> **2.    Whether Fisher Can Demonstrate That the Alleged Joint-Venture Agreement Was in Effect at the Time of Tice's Alleged Breach**

Tice points to four portions of the evidentiary record as demonstrating there is no genuine dispute that her chocolate venture with Fisher dissolved or terminated[10] on July 12, 2010, before

---

[10] Tice appears to use the words "dissolved" and "terminated" interchangeably, despite their distinction in the law, arguing that there was "[nothing] to wind up" in the joint venture after its dissolution. (*See* Def. Reply, at 5 n.5.) According to Tice, the alleged joint venture "had

she embarked on her separate venture, Lily's Sweets, without Fisher.  First, Tice highlights

Fisher's July 12, 2010 email to Tice, in which Fisher wrote, "I think it is best to go our separate

ways," and to which Tice later replied, "[t]he conclusion in your email is fine."  (Def. Mem.,

at 16.)  At her deposition, Tice testified that she interpreted Fisher's email to mean they "were

ending all business together" (Tice Dep., at 181), and, on her motion, Tice now asserts that this

was the plain meaning of Fisher's message (Def. Mem., at 1-2).  Second, Tice points to various

admissions and undisputed statements in the record demonstrating that Fisher stopped

communicating with Tice regarding the chocolate venture and stopped working on it after their

July 12, 2010 email exchange.  (*Id.* at 16-17.)  Third, Tice flags Fisher's subsequent agreement

to market RRG's chocolate bars as conduct that is supposedly "consistent" with the termination

of their chocolate venture.  (*Id.* at 10-11; Tice Decl. ¶ 16.)  According to Tice, Fisher would have

had a conflict of interest in promoting RRG's chocolate bars and simultaneously going forward

with the chocolate venture's planned products.  (*Id.*)  Fourth, Tice calls attention to Fisher's

October 2011 email to Krivit's sister about the chocolate venture, in which Fisher wrote that she

and Krivit "tried to do a business thing together but the wheels came off."  (Def. Mem., at 17.)

In opposition, Fisher presents additional contextual facts and different interpretations of

Tice's identified evidence.  (Pl. Opp. Mem., at 8-17.)  First, as to the July 12, 2010 email, Fisher

suggests an alternate interpretation as to the meaning of her "go our separate ways" statement,

arguing that this only pertained to Fisher and Tice's Coast to Coast relationship.  (*Id.* at 9-10.)  In

this regard, Fisher notes the undisputed fact that she and Tice had fought regarding their Coast to

Coast relationship in the past, but then still continued pursuing their chocolate venture together.

---

no bank account, no leases, no contracts, no protectable assets, and no liabilities" to wind up
following dissolution.  (*Id.*)

(*Id.* at 12.)[11]  Second, as to the admitted fact that she ceased working on the chocolate venture

after July 12, 2010, Fisher highlights evidence showing that she and Tice had divided their

responsibilities for the chocolate venture, such that, until Tice completed her part of the

chocolate venture, Fisher would have had nothing to do.  (*Id.* at 14-15.)  Fisher also offers an

explanation as to why she and Tice stopped communicating about the project after July 12, 2010.

On this point, Fisher notes that her duties at her day job increased, that she began to have health

issues (culminating in a cancer diagnosis in September 2011), and that she learned from her fight

with Tice that Tice could not dedicate her time to matters that did not produce immediate

income.  (*Id.* at 14-15.)  Third, regarding her agreement to market RRG's chocolate bars, Fisher

argues that Tice has failed to identify any evidence that that agreement had any bearing on the

parties' chocolate venture.  (Pl. Opp. Mem., at 16; *see also* Fisher Dep., at 243-44 (denying any

conflict of interest); Scileppi Decl., Ex. BB (unexecuted service agreement between RRG and

Fisher).)  Finally, with respect to her "wheels came off" email, Fisher calls attention to her

deposition testimony, in which she explained that the phrase meant that she and Krivit had been

waiting for a year for Tice to provide a marketable product, and that she (Fisher) had grown ill.

(Pl. Opp. Mem., at 15.)  Fisher also asserts that a reasonable jury could interpret the phrase, "the

wheels came off," to imply that the "wheels could have been put back on," if, for example, Tice

were to have shared with her the stevia chocolate formula that Tice later used for Lily's Sweets.

(*Id.*)

---

[11] Fisher also suggests that Tice never subjectively believed that Fisher had terminated the chocolate venture, and calls Tice a liar when she says otherwise.  (Pl. Opp. Mem., at 1, 12-13.)  As it is not this Court's role on summary judgment to make credibility assessments, it will not consider Fisher's assertion that "[Tice] lies" or either party's discussion of Tice's "subjective" beliefs.  *See Fischl*, 128 F.3d at 55.

Having examined all of the evidence presented by both parties on these points, this Court concludes – despite finding the question to be somewhat close – that Tice has the better overall argument.  Taken in isolation, no particular piece of evidence proffered by Tice can be characterized as determinative, and, indeed, Tice may read too much into some of the evidence she cites.  Nonetheless, when the evidence is viewed collectively, no reasonable jury could find that the joint venture between Fisher and Tice, assuming it once existed, was still in existence at the time that Tice started her own company, to market her own chocolate.

Standing alone, Fisher's July 12, 2010 email to Tice is certainly susceptible to two interpretations.  On the one hand, the phrase "I think it is best to go our separate ways" might appear to be an unequivocal dissolution of all of Fisher and Tice's business together.  On the other hand, the phrase is part of a longer email message (two pages, single-spaced), which discusses expressly, and in detail, Fisher and Tice's business relationships with Coast to Coast and RRG.  (Scileppi Decl., Ex. W, at 2.)  Fisher did not actually mention or allude to the chocolate venture anywhere in that email (*see id.* at 1-2), and neither did Tice in her responsive email or in the letter that she attached to that email (Smith Decl., Ex. 47).  Moreover, Tice never confirmed with Fisher that the "separate ways" statement included the chocolate venture, or expressly indicated to Fisher, after the email exchange, that she was withdrawing from that venture.  (Tice Dep., at 175-76, 189.)  Additionally, the parties do not dispute that the contentious telephone call that led to this email specifically related to Tice rejecting Fisher's offer to work with RRG.  (Def. 56.1 Stmt. ¶¶ 58, 59.)

Furthermore, Fisher correctly points out that she and Tice had fought about their non-chocolate venture business dealings in the past, but nonetheless continued working on their chocolate venture together afterwards.  (*See, e.g.*, Smith Decl., Ex. 18; Def. 56.1 Stmt. ¶¶ 28-30;

Pl. 56.1 Stmt. ¶¶ 28-29.)  As described above, Tice wrote Fisher an email in July 2009, stating that Fisher had underpaid Tice for her work at Coast to Coast, "manipulated" her, and treated her in a way that was "painful and insulting."  (Smith Decl., Ex. 18.)  Tice testified that, following this email exchange, she was angry at Fisher "for a whole year."  (Tice Dep., at 155-56.)  Despite this anger, the record shows that they continued to pursue their chocolate venture together afterwards.  (*See* Def. 56.1 Stmt. ¶¶ 28-30; Pl. 56.1 Stmt. ¶¶ 28-29.)  In this context, a reasonable jury could read Fisher's July 12, 2010 email *not* as an unequivocal dissolution of the chocolate venture, but rather as part of a fight about unrelated business dealings that Fisher and Tice would have been able to compartmentalize, just as they did in 2009.

A reasonable jury could also view the language and tone of the July 2010 email exchange as akin to that of the July 2009 email exchange, which might further suggest that the July 2010 email exchange did not constitute an unequivocal dissolution of the chocolate venture.  In the parties' July 2009 emails, which Tice testified made her angry at Fisher for a whole year, Tice wrote that she "really really love[d] and adore[d]" Fisher.  (Smith Decl., Ex. 18.)  Fisher wrote back stating that she "missed [Tice] so much" while Tice was on vacation, and that, without Tice, "[her] day [ ] seemed so bleak and unpromising."  (*Id.*)  Similarly, in the July 2010 email exchange – which Tice contends dissolved the chocolate venture – Fisher wrote that she was "really sorry for what [she] said" on their telephone call and "if [she] could take it back if [she] would."  (Scileppi Decl., Ex. W.)  Fisher also wrote to Tice, "please know how thankful I am for your friendship."  (*Id.*)  Tice then wrote back thanking Fisher for her apology, apologizing to Fisher for her own behavior, and stating, "I love you and I still want to be your friend."  (Scileppi Decl., Ex. AD.)  Although the July 2009 email did not include a phrase similar to, "I think it best to go our separate ways," a reasonable jury could nonetheless view the language and tone of the

July 2009 and July 2010 email exchanges to be similar, and draw the conclusion that, as the July 2009 email exchange did not prevent Fisher and Tice from moving forward with the joint venture, neither did the July 2010 email exchange.  Moreover, given the language in the July 2010 email exchange regarding these parties' apologies and friendship, a reasonable jury could reject a characterization of the emails as demonstrating any "intense animus" between Fisher and Tice.

Accordingly, if Tice were to rest her argument solely on the July 12, 2010 email exchange, this Court would find an issue of fact that would preclude summary judgment in Tice's favor.  Coupling the email, though, with the protracted period of silence and inactivity that followed, and with Fisher's eventual admission that "the wheels came off" the chocolate venture, creates a different picture.

As discussed above, it is undisputed that, following their July 2010 email exchange, Fisher and Tice did not communicate at all regarding the chocolate venture for *nearly two years* – that is, until March or April of 2012, when Tice reportedly informed Fisher about Lily's Sweets.  (Def. 56.1 Stmt. ¶¶ 65, 70; Fisher Decl. ¶ 32.)  It is also undisputed that Fisher did not work on the chocolate venture during this entire, lengthy period.  (Def. 56.1 Stmt. ¶¶ 65, 70.)  Even viewing the record in the light most favorable to Fisher and drawing all reasonable inferences in her favor, it is difficult to see how a jury could hear this additional evidence and still accept Fisher's proffered interpretation of her July 2010 email.  *See Aronow*, 714 N.Y.S.2d at 52; *Mashihi*, 859 N.Y.S.2d at 202-03.

It is possible that a reasonable jury could credit Fisher's explanation that, after their July 12, 2010 fight, she did not initially contact Tice regarding the chocolate venture or work on it because her responsibilities at her day job increased and because she was limiting contact with

Tice, given that, in their fight, Tice had expressed a need to be compensated for her time.  (*See* Fisher Dep., at 233-34, 238-39.)  A reasonable jury could also find that Fisher did not work on or communicate with Tice about the chocolate venture as time went on because she was dealing with health issues relating to her September 2011 cancer diagnosis.  (*See id.* at 238-39.)  A reasonable jury might even believe Fisher's argument that she did not work on the chocolate venture after July 12, 2010 because she and Tice had supposedly agreed to divide responsibilities in a way that left Tice with the task of product development and Fisher with nothing to do until the chocolate bar was ready to be marketed.  (*See id.* at 233-34; Fisher Decl. ¶ 22.)[12]

It strains reason, however, that these varied explanations for Fisher's silence could satisfactorily answer the question of why Fisher – for the entire 13 month period in between the July 12, 2010 email exchange and her September 2011 cancer diagnosis – *never once* had a "conversation with [Tice] about the development of the chocolate bar" or even "sen[t] a letter or pick[ed] up the phone" to ask Tice "how [she was] doing on finalizing the development of [the] chocolate bar."  (*See* Fisher Dep., at 234-35; *see also* Def. 56.1 Stmt. ¶ 65; Pl. 56.1 Stmt. ¶ 65.)  This sudden and apparent lack of interest in the progress of the chocolate venture is particularly indicative of a dissolution given Fisher's testimony that she was previously "involved every step

---

[12] Although not an argument advanced by Plaintiffs, a reasonable jury could also find that the inactivity of the chocolate venture was consistent with the relatively slow pace of the venture up to that point in time.  It is undisputed that the idea for the chocolate project came about in June or July 2009, and by July 2010, the project did not have its own business plan, a final product, or final graphics.  (*See* Tice Dep., at 214-15, 223-25; Fisher Dep., at 235; Def. 56.1 Stmt. ¶¶ 28-29, 38-39, 41, 66; Pl. 56.1 Stmt. ¶¶ 28-29, 66.)  Additionally, unlike in Fisher and Tice's prior beverage venture, there is no evidence that in over a year of work, they formed a company dedicated to the chocolate venture, conducted a trademark search, conducted focus groups, opened a bank account, or made presentations to potential investors.  (*See* Def. 56.1 Stmt. ¶¶ 16, 17, 21-23.)  The evidence even shows that the graphics portion of the project was completely dormant between January 2010 and May 2010, and then seemingly put on hold indefinitely in June 2010.  (Def. 56.1 Stmt. ¶¶ 38-40; Pl. 56.1 Stmt. ¶ 40.)

of the way" with respect to finding a marketable stevia-sweetened chocolate formula. (*See* Fisher Dep., at 175-77.)

Moreover, read in the context of the July 2010 email exchange and the extended lack of communication about the chocolate venture that followed it, Fisher's eventual October 2011 email to Krivit's sister can only reasonably read to have one meaning – that, to Fisher's own understanding, the chocolate venture had, in fact, ended. In that October 2011 email – written almost a year and a half after Fisher and Tice agreed to go their "separate ways" and after almost a year and a half of silence and inactivity regarding the chocolate venture – Fisher informed a third party that she and Krivit had "*tried* to do a business thing but the wheels came off." (Smith Decl., Ex. 62 (emphasis added).) Given Fisher's concession, at her deposition, that this statement pertained to the chocolate venture involving her, Krivit, *and Tice* (*see* Fisher Dep. 261-64, 310), the only manner in which a reasonable jury could read this statement, in its full context, is as an admission by Fisher that she and Tice had, in the past, "tried" to pursue a chocolate venture, but failed.

For these reasons, this Court concludes that summary judgment should also be granted to Tice on Fisher's claims against her.[13] In the end, Fisher's proffered evidence, taken as a whole,

---

[13] This Court reaches this conclusion without any reliance on Tice's additional argument that Fisher would have been "conflicted" from marketing RRG's chocolate, if she had still been pursuing the chocolate venture with Tice. On this point, Tice has submitted no evidence in admissible form to demonstrate that the RRG product in question would have competed directly with the product that was the subject of the chocolate venture, or that Fisher had any exclusivity agreement with RRG that would have prevented her from pursuing the chocolate venture. (*See* Def. Mem., at 10-11 (citing RRG's Proposed Intervenor Complaint); Tice Decl. ¶ 16.) In contrast, Fisher – the party who actually entered into the agreement with RRG – denied, under oath, any conflict of interest (Fisher Dep., at 243-44), and has placed before the Court an exhibit that purports to document her agreement with RRG – and that is silent as to any issue of exclusivity (*see* Sclieppi Decl., Ex. BB).

would not permit a fair-minded jury to find that her alleged joint venture with Tice continued to exist up through the time when Tice formed Lily's Sweets. Considering the totality of the record, this Court is persuaded that there is no genuine dispute that Fisher and Tice unequivocally agreed to dissolve their chocolate venture by words and actions before Tice engaged in any conduct that could potentially constitute a breach of the claimed joint-venture agreement or its attendant fiduciary duty. As noted above, a partner to an at-will joint venture may dissolve the venture "without liability for breach of contract . . . *at any time by any act* which evidences intent to terminate the association." *Kidz Clos, Inc.*, 320 F. Supp. 2d at 172 (emphasis added) (internal quotation marks and citations omitted); *see also Ebker*, 741 F. Supp. at 468-69 (noting that a party to a joint venture may dissolve the venture "on a moment's notice without liability for breach of contract"); *Aronow*, 714 N.Y.S.2d at 52 ("A party's silence after a repudiation can demonstrate the abandonment of a joint venture."). Moreover, once a joint venture is dissolved, the fiduciary relationship between the parties to the joint venture terminates. *Ebker*, 714 F. Supp. at 468-69 (citations omitted). Accordingly, without a continuing joint-venture agreement or fiduciary relationship between them, Tice cannot be liable to Fisher for breach of contract or breach of fiduciary duty for her conduct related to Lily's Sweets.

For these reasons, I respectfully recommend that Tice be granted summary judgment, dismissing Plaintiffs' claims in their entirety.[14]

---

[14] Given this Court's conclusion that summary judgment is warranted as to all claims in this case, this Court does not reach Tice's additional arguments that a constructive trust is an improper remedy in this case and that the Plaintiffs' breach-of-fiduciary-duty claim is time-barred.

III.   **TICE'S MOTION FOR RULE 11 SANCTIONS**

In addition to moving for summary judgment, Tice has separately moved for an order

pursuant to Rule 11 of the Federal Rules of Civil Procedure dismissing the Complaint with

prejudice and requiring Plaintiffs and their counsel to pay Tice's reasonable attorneys' fees and

costs.  (Def. Sanctions Mot., at 1.)  As mentioned above, the basis for Tice's sanctions motion is

that Plaintiffs' Complaint lacked a factual and legal basis, and that a reasonable pre-filing inquiry

by Plaintiffs' counsel would have revealed this.  (*See* Def. Sanctions Mem., at 1.)  In support of

her sanctions motion, Tice largely relies upon and repeats the arguments contained in her motion

for summary judgment.  Plaintiffs respond that they had more than a sufficient evidentiary and

legal basis for their Complaint, also repeating the arguments they raised in connection with the

summary judgment motion.  (*See, e.g.*, Pl. Sanctions Opp. Mem., at 2, 17, 21.)

An order granting summary judgment does not require that a motion for sanctions related

to the same underlying complaint be granted as well.  *See Young v. Suffolk Cnty.*, 922 F. Supp.

2d 368, 397 (E.D.N.Y. 2013) (denying the defendants' motion for Rule 11 sanctions despite

granting the defendant's motion for summary judgment) (citations omitted); *see also*

*Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 422 (1978) (disapproving of the

"hindsight logic" that "because a plaintiff did not ultimately prevail, his action must have been

unreasonable or without foundation"); *Sedacca v. Mangano*, No. 12cv1921 (DRH) (AKT), 2014

WL 1392224, at *4 (E.D.N.Y. Apr. 9, 2014) (denying a Rule 11 sanctions motion despite

disagreeing with a party's argument).  Indeed, Rule 11 sanctions target situations "where it is

patently clear that a claim has absolutely no chance of success under the existing precedents, and

where no reasonable argument can be advanced to extend, modify or reverse the law as it

stands."  *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1993) (internal quotation

marks and citation omitted); *see also Pannonia Farms, Inc. v. USA Cable*, 426 F.3d 650, 652 (2d

Cir. 2005) ("Although the imposition of sanctions is within the province of the district court, any

such decision should be made with restraint and discretion." (internal quotation marks, citation,

and alteration omitted)).  Furthermore, all doubts as to whether Rule 11 sanctions are appropriate

must be resolved in favor of the signing attorney.  *See Oliveri v. Thompson*, 803 F.2d 1265, 1275

(2d Cir. 1986).

    In this case, while this Court recommends that summary judgment be granted to Tice, it

finds that the arguments raised by Fisher and Krivit in opposition to the summary judgment

motion, regarding the factual and legal bases of their Complaint, were not frivolous and, indeed,

that they had the better of some of those arguments.  In fact, as noted above, many of the

individual points raised by Tice in her summary judgment motion were not, in themselves,

persuasive; rather, this Court's ultimate view as to the lack of any triable issue of fact was

reached only after close scrutiny of the entire presented record, viewed as a whole.  Certainly, in

light of Plaintiffs' detailed discussion of the evidence, and the fact that the state courts have not

been uniform in their opinions regarding how the requirements of a joint venture may be

satisfied, this Court has no basis for concluding that, before signing and filing the Complaint,

Plaintiffs' counsel failed to make a reasonable inquiry into the relevant facts or law.

    Under the circumstances, I recommend that Plaintiffs' motion for Rule 11 sanctions be

denied.

## **CONCLUSION**

    For all of the foregoing reasons, I respectfully recommend that:

    (1)    Defendant's motion for summary judgment (Dkt. 40) be
           granted in its entirety, dismissing Plaintiffs' claims with
           prejudice;

    (2)    Defendant's motion for Rule 11 sanctions (Dkt. 58) be denied.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan, United States Courthouse, 500 Pearl Street, Room 2240, New York, 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Kaplan. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBEJCTIONS AND WILL PRECULDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
       July 5, 2016

                                        Respectfully submitted,

                                        DEBRA FREEMAN
                                        United States Magistrate Judge

Copies to:

The Hon. Lewis A. Kaplan, U.S.D.J.

All counsel (via ECF)